## The Chicago, Rock Island & Pacific Railway Co. v. Clarence W. Galloway.

### Gen. No. 13,529.

1. Assumed risk—*when doctrine of, does not apply as against inexperienced servant.* It is the duty of a master to inform an inexperienced servant of dangers ordinarily incident to the service, and if he fails therein and the servant has no opportunity to learn of them, the latter will not be held to assume risks not obvious to one of his age, experience and judgment.

2. Master and servant—*duty of former to furnish latter safe place to work.* It is the duty of the master to furnish to his servant

a reasonably safe place to work, and to use proper diligence to keep such place in a reasonably safe condition. The servant is not required to make a critical and careful examination of his surroundings at the place where he is sent to work. He has the right to assume that the place is reasonably safe, unless obviously unsafe.

Action in case for personal injuries. Appeal from the Superior Court of Cook county; the Hon. Arthur H. Frost, Judge, presiding. Heard in this court at the March term, 1907. Affirmed. Opinion filed December 2, 1907.

Statement by the Court. The appellee recovered a judgment against appellant in an action on the case for negligence, for the sum of $9,000, from which judgment this appeal is. The declaration consists of four counts.

In the first count it is averred that, to wit, November 24, 1904, the defendant had, at Blue Island, in Cook county, a roundhouse and turn-table used for storing and turning engines in use by defendant along the line of its road. Plaintiff was a youth and without knowledge and experience of the danger about and upon said turn-table, and it was appellant's duty to fully inform him thereof. On the day aforesaid plaintiff was employed by defendant to operate said turn-table at night, and while so employed, and while exercising ordinary care for his safety, he was injured by reason of a certain engine, while about to run over said turn-table, striking him, owing to the negligence of the defendant in not informing plaintiff of the danger incident to the operation of said turntable, etc.

The negligence averred in the second count is, that the defendant did not provide plaintiff with a reasonably safe place to work, but maintained a defective, unsafe and dangerous turn-table, the danger and unsafety of which were unknown to plaintiff, and plaintiff was caught between and held by certain parts of said turn-table, so that a certain engine thereon struck and knocked plaintiff down, etc.

In the third count it is averred that the defendant, for a long time allowed the turn-table to be out of re-

pair, with knowledge thereof, so that when an engine
was running thereon, the platform of the turn-table
would sink, and the weight of the engine would cause
the machinery which operated the turn-table to be set
in motion, and making it dangerous to operate the
same. Plaintiff was assisting in backing an engine on
the turn-table, and exercising ordinary care, when
it became necessary for him to cross the turn-table to
prevent it from starting, by the setting in motion of
said machinery, and, when in the act of crossing, his
foot, by reason of said negligence, was caught in said
turn-table and the engine backed over him and crip-
pled and disabled him.

In the fourth count it is averred that defendant
maintained the turn-table in an unsafe and dangerous
condition, the ties being placed at such a distance
apart that there was just space enough between them
to permit the foot or leg of one passing over them
to be caught and held, and thus exposed to the danger
of being injured by an engine running on the turn-
table; and plaintiff, while assisting to back an engine
onto the turn-table at night, and when there was little
light, stepped into an opening between said ties, and
his foot became fast therein, and he was struck by an
engine backing on said turn-table, etc.

The defendant pleaded the general issue, the court
overruled defendant's motion at the close of the evi-
dence to take the case from the jury, the jury found
the defendant guilty and assessed plaintiff's damages
at the sum of $9,000, the defendant moved for a new
trial and in arrest of judgment, and the court over-
ruled said motions and rendered judgment on the ver-
dict.

MARCUS L. BELL, for appellant; BENJAMIN S. CABLE,
of counsel.

CHARLES N. FOELL, MORSE IVES, and EARL J. WALKER,
for appellee.

MR. JUSTICE ADAMS delivered the opinion of the court.

The width of the turn-table was twelve feet; it had one track, of standard gauge, with a plank platform forty-two to forty-eight inches wide outside of each rail. The ties between the rails were not covered over, nor were the spaces between them filled in. The ties were eight-inch square timbers, with flat sides, and were set from three to four inches apart.

The turn-table turned about a center pivot, and the weight of the table rested upon the center. Beneath each end of the turn-table were four small wheels running upon a circular rail at the edge of the pit, the table being so designed that when the load was balanced upon the center these wheels would clear the circular rail by one inch.

The table was operated by a Fairbanks-Morse turn-table outfit, consisting of a six-horse-power gasoline engine and certain levers and clutches. This machinery was at one end of the table at the right hand side as you walked upon the table, and was covered with a frame shanty. The door of the shanty was about three feet from the end of the table.

Plaintiff was employed about November 14, 1904, as night turn-table operator. His hours were from six at night until six in the morning. His duties were to set or "spot" the table when an engine approached. turn the table when the engine was upon it, and set the table again for the next engine. He also had to blow out the headlights as the engines came in from the road, and fill oil cans. After the table was spotted for a locomotive to come upon it, plaintiff would signal to the hostler or man in charge of the locomotive, that the table was ready, giving this signal with a hand lantern which he always carried. When the engine approached the table in forward motion, plaintiff could stand at the door of the shanty above referred to, and give the signal; but when an engine was to be backed on the table, plaintiff, in order to signal the hostler,

had to stand on the opposite side of the table from the shanty, because the hostler was on that side. About twenty-five or thirty engines crossed the table every night.

Jim Coffman, plaintiff's predecessor as night turn-table operator, remained with him the first three nights he was at work, instructing him in his duties.

Plaintiff was twenty years, four months, and twenty days of age at the time of the accident.

About nine o'clock in the evening of November 24, 1904, which was the tenth evening of plaintiff's employment, engine 101, a small switch engine, with hostler Harry Kline at the throttle, backed up to within forty or fifty feet of the table, preparatory to crossing, and stopped. Galloway gave Kline a signal to come on; Kline started the locomotive, and Galloway attempted to cross the track in order, as he testified, to reach a certain lever in the table-house. His foot slipped in between the ties, and before he could extricate it the engine ran over his right leg and so mangled and lacerated it that it had to be amputated about seven inches below the hip.

The defendant's counsel contend that the verdict is contrary to the weight of the evidence and that the danger, if any, incident to the operation of the turn-table was obvious and the plaintiff assumed the risk. The plaintiff, prior to the time of his employment by the defendant, had never been employed in railroad work, and had no experience in operating a turn-table. A young man, one James Coffman, was the turn-table operator at the time plaintiff was employed. Coffman applied to Mr. State, the superintendent of the roundhouse, for another job, who told him to wait until he, Coffman, could get another man to operate the turntable, and break him in. Coffman then procured the plaintiff, who was employed by the defendant, and Coffman set him to work and remained with him three nights instructing him how to operate the turn-table. The plaintiff testified, in substance, as follows: Coff-

man told him what to do, but neither he nor any one spoke to him of any danger incident to his work.   He says that during the time he operated the turn-table, the tongue or dog of the brake lever, which lever was used for spotting the tracks and holding the table, was so worn that it would not hold in the notches, and he went to Mr. Hays, the night foreman, about it, who told him to be there and hold it down, before any engine came on the table, and that if he did not hold it down before an engine came onto it, the engine would climb a rail and get into the ditch.   Coffman also instructed him in regard to holding the lever when trains were passing upon the turn-table.   He testified:  "He told me to do the same way he did, to cross over when I was on the opposite side of the track, to cross over before the engine, and the jar would be so great I would have to hold on to the brake.   That was the way I did it."   Coffman also testified to the defective condition of the. brake lever, and that he instructed the plaintiff to be at the lever and hold it down when an engine came onto the turn-table, and defendant's counsel, in their argument, say that plaintiff's duties required him to cross the turn-table fifty to one hundred times each night.   Plaintiff also testified that he had to be on the right side of the engine as it faced forward, which would be the side opposite to the lever, when an engine was backing in.

The evidence is that plaintiff's duty when an engine was approaching the turn-table, was to set the table, that is, to bring it to a position in which the rails on the table would be in line with the rails on which the engine was, and when this was done, to signal the hostler in charge of the engine.   To do this he was, as he testified, directed to be on the right side of the engine, as the engine faced forward, because the hostler was on that side of the engine.   The engine which struck plaintiff was approaching the turn-table, rear end forward, on its way to the roundhouse, and plaintiff's place in setting the turn-table was in the shanty,

where the operating machinery of the turn-table was, so that to signal the hostler of the engine, he had to cross to the side of the turn-table opposite to the shanty with his signal lantern. He testified, in respect to the accident: The engine was forty or fifty feet away, and he was on the side opposite to the shanty, with a lantern, and gave the signal, and then started to cross to the shanty, and as he was crossing his right foot slipped in between two of the ties and was caught fast, so that he could not extricate it. He testified that the night was dark and misty, that there was no light on the rear end of the engine, that two arc lights at the end of the roundhouse, which were usually lit, were out, and there were two red lights, one on each side of the center of the turn-table. At the time he had on a pair of heavy soled shoes a little over three inches wide.

Coffman testified that before plaintiff was employed he had been operating the turn-table at night for three weeks steadily. His testimony corroborates that of the plaintiff. He testified that he remained with the plaintiff three nights and showed him how to put the engines in and take them out, and how to hold the lever, and where to go to signal engines, to go to the right side of the engine. He says: "I would do that when the engines were backing in; when they were coming in forward I would stay right there." In regard to the brake lever he testified that it went down into a kind of cog and held only one-sixteenth of an inch, and when an engine came in it would throw the table off if the lever was not down to hold it. The tongue was worn off on the side which went against the cogs, and it was that way nearly all the time he was there, and was in the same condition when plaintiff was employed, and that he talked to the foreman about it three or four times, once a night or two before the plaintiff was employed; that he saw the engine backing up about twenty-five or thirty feet away, before the plaintiff was hurt, and that it was dark at

the time.    It was supposed to be lighted, but the lights would go out once in a while.    On cross-examination witness testified that the ties were uncovered and were greasy from water and grease dropping from the engines, and that he did not call plaintiff's attention to their condition.

John Newman, who was a watchman in defendant's employ, testified that he was not there at the time of the accident, but was immediately after it, and says: "I went over there and I seen the boy lying down, and his feet were sticking up, and his leg was torn right off.    I don't know how far it was from the end of the turn-table, not twenty-five feet, about fifteen feet.    His leg was under the body, separated from the body, about eight or ten feet from him, and the foot was wedged down between two ties, and the sole of the shoe was loose from the upper, where he tried to extract his foot.    The ties were from three to four inches apart, I believe."    Witness says he tried to get the foot out, but could not; also that it was dark where he was lying.

Mary L. Galloway, step-mother of the plaintiff, merely testified that plaintiff was healthy and strong before the accident.

The foregoing were all the witnesses called on behalf of the plaintiff.

We will now consider the evidence for the defendant.    There is a conflict in the evidence in respect to the question, whether the plaintiff was cautioned in respect to the danger incident to his employment.    He and Coffman testifying that he was not, and F. E. Hays, the night foreman, testifying that he cautioned him.    Hays testified that he cautioned plaintiff to stand by the side of the table next to the ground, where he could give the man handling the locomotive any signal necessary, and also cautioned him of the danger of crossing the track in front of an engine; that he should not cross until the engine had passed onto the table.    On cross-examination he testi-

fied that he had a conversation with plaintiff between
six and eight o'clock, the first day he went to work,
and that Coffman was present when he cautioned him.
Coffman, called in rebuttal, testified that he was with
plaintiff the first three nights he worked, and that
Hays, during those three nights, did not give plaintiff
any instructions. It appears from Coffman's testi-
mony when first called as a witness, that Mr. State
told him that he was to break his successor in, which
would seem to include the giving of necessary instruc-
tions. The defendant, in the cross-examination of the
plaintiff and of Coffman, produced a lever which it
claimed to be the brake lever which was on the turn-
table while Coffman and the plaintiff operated the
table, and questioned Coffman and the plaintiff as to
whether it was the same. Both Coffman and plaintiff
testified that it was not the same lever, and pointed
out in what it differed from the one in use when they
operated the turn-table. The defendant put the lever
in evidence and part of the ratchet on which it worked,
and presumably these were taken by the jury to their
room when they retired to consider of their verdict;
but they have not been certified up with the record and
are not before us. The evidence for the defendant is
mainly directed to proving that the lever which it in-
troduced in evidence was the one on the turn-table at
the time of the accident, and that the turn-table was
properly constructed and in good condition.

It appears from defendant's evidence that the turn-
table in question, exclusive of the operating machin-
ery, was about two years old, and that the operating
machinery, which the witnesses call "the outfit," was
taken from a former turn-table, on which it had been
used about four years, so that it had been in use, at
the time of the accident, about six years.

Hays, the night foreman, did not in his testimony
deny the plaintiff's testimony that he told the plaint-
iff to be at the lever, before an engine came on the
turn-table, and hold it down, and that if he did not

the engine would climb a rail and get into the ditch, nor was this testimony of plaintiff contradicted by any one. Assuming the truth of the testimony of the plaintiff and Coffman, such an instruction was necessary. Plaintiff testified that the brake was worn so that it would not hold, and that when an engine came on it threw it off. Coffman testified that the tongue of the lever went down and into the cog about one-sixteenth of an inch, and that when an engine came on it would throw it out, if he had not hold of it, that the table would fly to the side and throw the engine off, and that he showed plaintiff how to hold the lever, and that several times, a night or two before plaintiff went to work there, he told the night foreman that the brake was out of order, that the catch was no good, and another one should be procured, and that the foreman kept saying he would get a new one. The evidence tends to prove that when an engine came in contact with the rails of the table, the table sometimes moved laterally. Hays testified: "The table has, in my experience, moved horizontally." Also, that "if the rails of the turn-table and the rails of the track were not directly opposite when the engine struck the turntable rails, it would turn the table horizontally; also, "The side motion I testified to would be at the time the front pair of wheels struck the table." The plaintiff was wholly inexperienced in railroad work, and had, prior to his employment by defendant, no experience whatever in operating a turn-table. He was working on a farm just before he was employed by the defendant. In 2 Bailey's Personal Injuries, section 2665, the author says: "It is the duty of an employer to inform an inexperienced servant of dangers ordinarily incident to the service, and if he fails therein and the employee has no opportunity to learn of them, the latter will not be held to assume risks not obvious to one of his age, experience and judgment. This was said where a young man eighteen years old, six feet tall and weighing one hundred and eighty pounds, was

killed while at work logging, by a log rolling upon him, and it appeared the work he was doing was attended by danger not obvious to one unaccustomed to the work, and that deceased had no experience and was not warned of the danger.'' Citing Atlas Engine Works v. Randall, 100 Ind. 293, and other cases. In that case the plaintiff's intestate had been at work for five days when he was injured. In 20 Am. & Eng. Ency. of Law, 2d ed., p. 97, the author says: ''If the master knows that the employment is dangerous, or ought to know it, and also knows that the servant is ignorant and inexperienced in the employment, and has no knowledge of the dangers incident thereto, it is his duty to warn the servant as to the danger and instruct him to avoid it. This is an imperative duty, and if the failure to perform it results in injury, the master is liable.'' Citing numerous cases, among them the following, which support the text: L. & N. R. R. Co. v. Hall. 87 Ala. 708, 719; Chislinsky v. Hooper & Townsend Co., 1 Marvel's Del. R. 273, 283; Hill v. Gust, 55 Ind. 45; Atlas Engine Works v. Randall, 100 ib., 293, 296-7; Sullivan v. India Man'g Co., 113 Mass. 396, 399; Wheeler v. Wason Mfg. Co., 135 ib. 294; Glover v. Dwight Man'g Co., 148 ib. 22; Palmer v. Mich. Cent. R'd Co., 93 Mich. 363; Brennan v. Gordon, 118 N. Y. 489, 494; Gates v. State, 128 ib. 221, 226.

Such is the law in this state also. Consolidated Coal Co. v. Haenni, 146 Ill. 614, 626; Dallman v. Saalfeldt, 175 ib. 310, 317; Alton Paving Brick Co. v. Hudson, 176 ib. 270, 273; P., C., C. & St. L. Ry. Co. v. Hewitt, 102 Ill. App. 434.

The evidence was sufficient to warrant the jury in finding that the plaintiff was inexperienced in the work which he was employed to do; that this was known to the defendant, and that he was not instructed as to the risks incident to the work. The evidence of plaintiff that he was instructed by Hays to hold down the lever when an engine was coming onto the turn-table

is uncontradicted, and warranted a finding that plaintiff was so instructed. If such instruction was given, it is immaterial, so far as plaintiff's duty is concerned, whether the lever was or was not defective. It is contended that the danger incident to crossing the track on the turn-table, after signaling the engine, was obvious and was assumed by the plaintiff. When plaintiff signaled the engine he was on the left side of the track of the turn-table, the opposite side from the shanty in which the lever was, which he had been ordered to hold down. The engine was then forty to fifty feet away. The width of the planking of the turn-table, outside the rail, was three and one-half to four feet, and the space between the tracks on the turn-table was four or four and one-half feet, so that a very few steps would have taken plaintiff to the shanty, and it is evident that he could have reached the shanty in safety had it not been for his foot slipping in between two of the ties and becoming inextricably fastened there. The plaintiff testified that Coffman, who was sent by the defendant to show plaintiff how to do his work, crossed the track to the shanty, across the turn-table ties, after giving the signal and before the engine reached the turn-table. He says: "Coffman showed me this at the time I first went to work there. I paid no attention to the ties; that the table was uncovered between the rails. I seen it that he done it, and I could do the same thing." The question is, whether the risk of having one's foot caught in one of the spaces three and and one-half or four inches wide, in crossing the turn-table track, was necessarily obvious to one inexperienced in railways and railway work. Plaintiff went to work for defendant November 14, 1904. His time of work was from 6 P. M. till 6 A. M. o'clock. At that time of year the sun set about 4:41 o'clock P. M. and rose about 6:48 o'clock A. M., and at night a light was required to enable plaintiff to do his work. Twenty-five or thirty engines crossed the turn-table every night, so that he had to be constantly on the lookout,

not knowing when an engine might come. Under such circumstances it was hardly to be expected that he would critically examine the distances between the ties. It is the duty of the master "to furnish to his employee a reasonably safe place to work, and use proper diligence to keep such place in a reasonably safe condition." Whitney & S. Co. v. O'Rourke, 172 Ill. 177; 185, and cases cited. The plaintiff was not required to make a critical and careful examination of his surroundings at the place where he was sent to work. City of LaSalle v. Kostka, 190 Ill. 130, 141. He had the right to assume that the turn-table was reasonably safe, unless obviously unsafe. "The rule that the servant assumes the ordinary risks incident to the business presupposes that his master has performed the duties of caution, care and vigilance which the law casts upon him. It is these risks alone, which cannot be obviated by the adoption of reasonable measures of precaution by the master, that. the servant assumes." Western Stone Co. v. Muscial, 196 Ill. 382-385. That the turn-table track was unsafe, by reason of the open spaces between the ties, is sufficiently illustrated by the accident.

In Sullivan v. India Manfg. Co., 113 Mass. 396, 399, it is said: "It may frequently happen that the dangers of a particular position for, or manner of doing work, are great and apparent to persons of capacity and knowledge of the subject, and yet a party, from youth, inexperience, ignorance, or general want of capacity, may fail to appreciate them." And in Louisville Ry. Co. v. Frawley, 110 Ind. 18, the court say: "The rule contended for by the appellant, that the employe impliedly assumes the risks of the service, and of such dangers as are obvious and open to ordinary observation, does not embrace such risks as the employer knows, or which by the exercise of reasonable care he might have known, beforehand, that the employe, by reason of his immaturity and inexperience,

is ignorant of, or such as the employer knows, the employe, without experience, cannot appreciate or avoid without instruction or warning." *Ib.* 24. We think it was a question for the jury on the evidence, whether the plaintiff appreciated the danger of his foot being caught between the ties, in crossing the track on the turn-table. The jury were fully instructed on every phase of the case, inclusive of the question whether plaintiff assumed the risk, and we do not think the verdict contrary to the weight of the evidence.

The judgment will be affirmed.

*Affirmed.*